## THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT, *v.* ELLIOTT W. TODD, APPELLANT.

*The question as to the meaning of "gaming," as defined in chapter 9 of title 10 of the Penal Code, considered — keeping a room where wagers are made as to the fluctuations in the price of stocks bought and sold in the New York Stock Exchange, as indicated by a stock quotation ticker, does not violate section 343 of the Penal Code.*

Upon an appeal from a judgment convicting the defendant of a violation of section 343 of the Penal Code for keeping a room used for gambling, it appeared that the transactions, which were alleged to constitute gambling, related to the fluctuation in the price of stocks bought and sold in the New York Stock Exchange, as indicated by a stock quotation ticker in the defendant's place of business, which was an open market, and so arranged that his customers could see the quotations which were recorded on a black-board and were correct statements of the dealings recorded in the stock exchange, and by which, if any dispute arose, it was to be settled.

A person wishing to purchase a stock, named by him, deposited a margin with the defendant and received an acknowledgment in printed form, by which he was entitled to buy stock, if called for before the "stock sells, . . . . . . . . per cent below or five per cent above contract-price." A similar form was received by persons wishing to sell before the "stock sold, . . . . . . . . per cent above or five per cent below contract-price." The blank, before the words "per cent" was filled in to correspond exactly with the sum deposited by the customer, which was generally one per cent. If the advance or decline were in favor of or against him the transaction was closed, either by the exhaustion of his margin, unless he enlarged his deposit, or the payment to him of his advance.

The intention was not to deliver the stock, but to settle the advance which was caused by the fluctuation of the value or price as indicated by the quotations mentioned.

*Held,* that although the contract was one of wager and not binding upon the parties, it did not violate the provisions of section 343 of the Penal Code, providing that "a person who keeps a room, shed, tenement, tent, booth, building, float or vessel, or any part thereof, to be used for gambling, or for any purpose, or in any manner forbidden by this chapter, is guilty of a misdemeanor."

That the various provisions contained in the said chapter 9 of title 10 were intended to prevent gambling, in the ordinary acceptance of that term, by cards, dice or other symbols of chance or hazard, in places more or less private or secluded, and which, in itself, without reference to any other element, was *malum prohibitum* and *malum in se.*

The object in view was to prevent the use of any place for playing or practicing any of the prohibited games or devices, or hazards or chances, fairly embraced within the purview of the statutes, and there was no intention manifest to include all matters of hazard, which might, by forced constructions, involve many legal transactions.

APPEAL by the defendant from a judgment of conviction rendered against him in the Court of General Sessions of the county of New York, on November 15, 1887, for keeping a room used for gambling.

*Freeling H. Smith* and *L. W. Emerson,* for the appellant.

*McKenzie Semple,* for the People, respondent.

BRADY, J.:

The transactions which were alleged to constitute gambling, under section 343 of the Penal Code, related to the fluctuation in the price of stocks bought and sold in the New York Stock Exchange, as indicated by a stock quotation ticker. The purchaser of a stock named by him would deposit a margin and receive an acknowledgment in printed form, with blanks properly filled, as follows:

" Mr. .................:.......

"In consideration of $...... received, can buy of the undersigned, if called for before the stock sells ...... per cent below or five per cent above contract-price, ...... shares ...... at ......

"E. W. TODD."

And, in case of a sale, a kindred document, with the necessary changes, as follows:

" Mr. ...................

"In consideration of $...... received, can. sell to the undersigned, if delivered before the stock sells ...... per cent above or five per cent below contract-price, ...... shares ...... at ......

"E. W. TODD."

The blank before the words "per cent" was filled in to correspond exactly with the sum deposited by the customer, which was

generally one per cent. If the advance or decline were in favor of or against him, the transaction was closed either by the exhaustion of his margin, unless he enlarged his deposit, or the payment to him of the advance. It was not a part of the scheme to deliver the stock, but to settle the difference which was caused by the fluctuation in value or price, as indicated by the quotations mentioned. These contracts, as stated by the learned trial judge, were not illegal *per se*, but might be if used and so intended as a mere disguise for gambling, for the reason that where an optional contract for the sale of property is made, and there is no intention on the one side to sell or deliver it, or, on'the other, to buy or take it, but merely that the difference should be paid according to the fluctuation on market values, the contract would be a wager within the statute. (*Bigelow* v. *Benedict*, 70 N. Y., 202; *Story* v. *Salomon*, 71 id., 420; *Harris* v. *Tumbridge*, 83 id., 92.) But it does not follow that a wager, though void and non-enforceable as a contract, constitutes a crime under chapter 9 of the Penal Code, or becomes a criminal offense under its provisions, and punishable as such.

The question here presented is distinctly whether the transactions mentioned are within these provisions. The appellant's place of business is an open market, and so arranged that his customers can see the quotations which are recorded on a black-board, and are correct statements of dealings recorded in the Stock Exchange, and by which, if any dispute arise, it is to be settled. There is nothing dependent upon chance or device which the appellant can influence or control, so far as the record develops the *modus operandi;* and the difference, therefore, between his transactions and those of the Stock Exchange, consist in settling by fluctuations without a purchase or sale of the stock. Assuming that it was not the intention of the customer or the appellant to buy or sell the stock embraced in the transaction consummated, and that the contract was one of wager and not binding, nevertheless it was not included in the category furnished by chapter 9 of title 10 of the Penal Code, entitled "gaming." The first section (336), relating to the subject under consideration, declares it unlawful to keep or use any table, cards, dice or other apparatus commonly used in playing any game, etc. Section 337 makes the violation of section 336 a misdemeanor, and section 338 makes the keeping of any article or apparatus, in viola-

tion of section 336, a public nuisance. Section 339 declares it a misdemeanor to win by fraud while playing at any game; and section 340 provides that any person exacting anything won by cards, or any other game of chance, or any bet upon the hands or sides of the players, shall forfeit five times the value thereof. Section 341 provides that "a person who wins or loses at play, or by betting at any time," the sum of twenty-five dollars or upwards within twenty-four hours, is punishable by a fine of five times the value or sum so lost or won, to be recovered in a civil action; and section 342 provides for the attendance and privilege of witnesses. These sections separately and collectively relate to games, *eo nomine*, games of chance played and by cards, dice or faro, or any other game of chance, wholly fortuitous and not connected in any way other than with the factors of the game itself, and illegal, *pe se*, without reference to the intention; an absolute hazard, not dependent upon legitimate fluctuations in legal business modes, and necessarily embracing only the playing of games of chance, as such, with table, cards, dice or other articles or apparatus, and the keeping of the same for such games of chance. It is quite manifest that these various provisions were intended to prevent gambling in the ordinary acceptation of that term by cards, dice or other symbols of chance or hazard, and in places more or less private or secluded, and which, in itself, without reference to any other element, was *malum prohibitum* and *malum in se*. And section 343 — which is as follows: " A person who keeps a room, shed, tenement, tent, booth, building, float or vessel, or any part thereof, to be used for gambling or for any purpose, or in any manner forbidden by this chapter, or being the owner or agent, knowingly lets or permits the same to be so used, is guilty of a misdemeanor " — was designed to punish for keeping a place where any of those games might be played — a place where any prohibited contrivance could be used or practiced. The word gambling occurs in this section for the first time, and is undoubtedly intended to relate to the games prohibited in the preceding sections and to embrace them only. This is the more apparent from the language of the section — " to be used for gambling, or for any purpose or in any manner forbidden by this chapter," that is, to be used for gambling forbidden by this chapter, or to be used for any purpose

# 450 PEOPLE v. TODD.

forbidden by this chapter, or to be used in any manner forbidden by this chapter. The proper construction of this section leads to this result. The object in view was to prevent the use of any place for playing or practicing any one of the prohibited games or devices, or hazards or chances designated or fairly embraced within the purview of the statutes. There is no intention manifest of including all matters of hazard which might involve many legal transactions by forced construction. There is an element of chance, of speculation, in all purchases which in the main are made for gain, and in which there may be either loss or profit to the parties, and perhaps both, for the seller may lose by selling too low and the purchaser profit by a good bargain. It must be observed, also, that the language employed consists of words of general import and designed to cover, beyond peradventure, all the prohibited games — a species of recapitulation in general terms. And when particular words are followed by general ones the latter are held to apply to persons and things of the same kind as those which precede. (Potter's Dwarris on Stat., 236 ; Sedgwick on Stat. and Com. Law, 425.) The accuracy of this interpretation is enforced by the provisions of some of the remaining sections ; 344, for example, declares what a common gambler is, and the three following sections provide for the seizure of articles suitable for gambling, specifying cards, dice, etc. And section 348 provides that a person who persuades another to visit any building used for the purpose of gambling, in consequence of which such person gambles therein, is guilty of a misdemeanor, and in addition thereto is made liable to such person for the money lost at play. It will have been observed that the sections relating to the destruction of gambling devices specify cards, dice, etc., thus indicating what is meant by the word gambling ; and that by the last section mentioned the word is again inferentially defined by providing for the recovery of money lost at play. Sections 349 and 350 have no application to the question discussed, and contain no provisions the consideration of which will aid in the solution of the question in hand.

The Penal Code, in reference to gaming, is substantially a re-enactment of the provisions of the Revised Statutes (see notes to section in Donnan's Annotated Code), and which were chiefly enacted before the introduction of many of the stratagems, devices

and symbols which are now in use, and are the offspring of inventions similar to the stock quotation indicator, thus illustrating what is maintained by some philosophers, with cogent reason, that immorality and crime keep pace with intellectual development and travel hand in hand with science and progress — with civilization which enlightens for good and for evil as well. However this may be, the result of the examination of the statute under which the appellant was convicted is that it was aimed at all games of chance, and lotteries, and betting on horse-racing and elections, but not against the transactions which distinguish the appellant's as one in the field of strategy if not in games. If the question were only whether the contracts made by the appellant were gambling transactions, there could be no doubt of the propriety of the judgment rendered herein, inasmuch as the evidence warrants the finding that they were mere disguises for gambling. (Cases *supra*.) And the appellant's place of business would be one kept for that purpose, but the appellant was indicted under one of a series of sections relating to the subject of gaming, and designed to cover the methods, devices and hazards then in the legislative mind, and of which the transactions of the appellant form, it would seem, no part. He was held under one of the sections which relate to the subject expressed in and covered by them, and that section must be interpreted by its relation to the whole context. The gambling inveighed against was such as the ordinary acceptation of that term included, unless otherwise expressed or particularized. The words of a statute are to be taken in their ordinary and familiar signification and import, and regard is to be had to their general use, and the intent is not to be collected from any particular expression, but from the whole act. (Potter's Dwarris on Stat., 193.) Statutes are to be read according to the natural and obvious import of their language. (Sedg. on Stat. and Const. Law, 260 ; *Waller* v. *Harris*, 20 Wend., 555–557 ; *Martin* v. *Hunter's Lessee*, 1 Wheat., 326 ; *Clark* v. *City of Utica*, 18 Barb., 451.) It is correctly insisted on this subject that the word gamble is a derivative of the word *gamen* from the Anglo-Saxon *gamen*, which means, to play. And, accordingly, the word " game " is defined by Webster " to play for a stake or prize ; to use cards, dice, billiards or other instruments, according to certain rules, with a view to win money or other

thing waged upon the issue of the contest; to practice playing for money or some other stake; to gamble." And Worcester defines it to be " to play at any sport, especially to play for money or any other stake;" and Bouvier declares gaming to be " a contract between two or more persons by which they agree to play by certain rules at cards, dice or other contrivance, and that one shall be the loser and the other the winner." Here there was no contest to be decided, no game *eo nomine* to be played. The result was to be determined by such fluctuations in the legal disposition of securities as marked their value or their price by sale or purchase at the Stock Exchange, and the hazard was dependent, therefore, upon such lawful transactions as might occur in regard to the stock. We are not called upon to do more than to say whether the appellant was lawfully convicted under section 343 of the Penal Code, and that must be answered by the interpretation of that section as it stands, without reference to any other statute or rule of law embracing such a crime, if any exist. The examination of the subject leads to the conclusion, however unfortunate that may be for the community, and however much it must be regretted, that the conviction was wrong and that it cannot, therefore, be sustained.

There can be no doubt of the objectionable, demoralizing nature of the appellant's business. It cannot be other than just such traps for the unwary that the legislature hoped to prevent, but which has failed in consequence of the ingenuity displayed in the method adopted to frustrate such design. But it is not beyond the reach of that body yet, and it is to be hoped that prompt action will be taken to overcome the evil and to punish the offender by proper and comprehensive enactments. It is true that devices beyond the sphere of any statute may be employed, but they can be met and crushed by further legislation. Many subjects have required a multitude of statutes in England and in this country to root out the wrong inveighed against, and the result has been a success. The transgressor may have short intervals under such a system, but the day of punishment will come at last.

The judgment should be reversed and new trial ordered.

VAN BRUNT, P. J., and DANIELS, J., concurred in the result.

Judgment reversed, and new trial ordered.